No. 25-30478

# In the United States Court of Appeals for the Fifth Circuit

VOICE OF THE EXPERIENCED, A MEMBERSHIP ORGANIZATION ON BEHALF OF ITSELF AND ITS MEMBERS; MYRON SMITH, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; DAMARIS JACKSON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; NATE WALKER, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; DARRIUS WILLIAMS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; KEVIAS HICKS; JOSEPH GUILLORY; ALVIN WILLIAMS, *Plaintiffs-Appellees*

v.

JAMES M. LEBLANC, SECRETARY, DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS; TIM HOOPER, WARDEN, LOUISIANA STATE PENITENTIARY; LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, *Defendants-Appellants*

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF LOUISIANA (NO. 23-CV-1304) (THE HONORABLE BRIAN A. JACKSON)*

**PLAINTIFFS-APPELLEES' REPLY BRIEF**

*(Counsel listed on inside cover)*

SAMANTHA POURCIAU
THE PROMISE OF JUSTICE INITIATIVE
1024 Elysian Fields Avenue
New Orleans, LA 70117
Tel:  (504) 529-5955
*sbosalavage@defendla.org*

LYDIA WRIGHT
RIGHTS BEHIND BARS
1800 M St. NW
Fnt. 1 #33821
Washington, D.C. 20033
Tel:  (202) 455-4399
*lydia@rightsbehindbars.org*

JOSHUA HILL JR.
JEREMY A. BENJAMIN
LEAH R. WEISER
CHIZOBA D. WILKERSON
PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:  (212) 373-3000
*jhill@paulweiss.com*
*jbenjamin@paulweiss.com*
*lweiser@paulweiss.com*
*cwilkerson@paulweiss.com*

KIMBERLY GRAMBO
PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel.: (202) 223-7300
Fax:  (202) 223-7420
*kgrambo@paulweiss.com*

ANNA M. STAPLETON
PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP
535 Mission Street, 25th floor
San Francisco, CA 94105
Tel:  (628) 432-5100
Fax:  (628) 232-3101
*astapleton@paulweiss.com*

## CERTIFICATE OF INTERESTED PERSONS

_____

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

| Parties | Counsel and Law Firms |
|---------|----------------------|
| PLAINTIFFS-APPELLEES<br>Voice of the Experienced,<br>also known as VOTE,<br>Myron Smith, Damaris<br>Jackson, Nate Walker, Darrius<br>Williams, Kevias Hicks, Joseph<br>Guillory, and Alvin Williams | PROMISE OF JUSTICE INITIATIVE<br>Samantha Pourciau<br><br>RIGHTS BEHIND BARS<br>Lydia Wright<br><br>PAUL, WEISS, RIFKIND,<br> WHARTON & GARRISON LLP<br>Joshua Hill Jr.<br>Jeremy A. Benjamin<br>Kimberly Grambo<br>Anna M. Stapleton<br>Leah R. Weiser<br>Chizoba D. Wilkerson |
| DEFENDANTS-APPELLANTS<br>James LeBlanc, Secretary,<br>Department of Public Safety<br>and Corrections;<br>Tim Hooper, Warden,<br>Louisiana State Penitentiary;<br>and<br>Louisiana Department of<br>Public Safety and Corrections; | KEOGH, COX & WILSON, LTD.<br>Andrew Blanchfield<br>C. Reynolds LeBlanc<br>Chelsea A. Payne<br><br>ATTORNEY GENERAL OF<br>LOUISIANA<br>Elizabeth B. Murrill<br>J. Benjamin Aguiñaga |
| AND<br>Gary Wescott, Secretary,<br>Department of Public Safety<br>and Corrections; and<br>Darrel Vannoy, Warden,<br>Louisiana State Penitentiary | |

*/s/ Jeremy A. Benjamin*
JEREMY A. BENJAMIN
*Attorney of Record for Appellees*

OCTOBER 27, 2025

ii

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................. 1

ARGUMENT .................................................................................... 3

I.  THE AUGUST 2025 ORDER COMPORTS WITH THE
    PLRA. ...................................................................................... 3

    A.  The Order Is a Successive Preliminary Injunction
        Permitted by the PLRA. ................................................. 4

    B.  The Challenged Relief Is Necessary, Narrow, and
        Minimally Intrusive, Satisfying Subsection
        3626(a)(2). ...................................................................... 11

II. THE DISTRICT COURT DID NOT COMMIT CLEAR
    ERROR IN FINDING PLAINTIFFS ARE LIKELY TO
    SUCCEED ON THEIR EIGHTH AMENDMENT
    CLAIMS.................................................................................. 15

    A.  The District Court Did Not Err in Finding DOC
        Likely Deliberately Indifferent. ................................... 17

        1.  DOC Concedes the Objective Prong..................... 18

        2.  The Subjective Prong Is Satisfied Because the
            Risks of DOC's New Policy Were Open, Obvious,
            and Known......................................................... 19

    B.  The Purported Remedial Measures Do Not Cure
        DOC's Deliberate Indifference. .................................... 25

III. THE DISTRICT COURT'S EQUITIES ANALYSIS
     WAS NEITHER INSUFFICIENT NOR CLEARLY
     ERRONEOUS. ....................................................................... 31

CONCLUSION ............................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alloway* v. *Hodge,*
    72 F. App'x 812 (10th Cir. 2003) .................................................. 5

*Amoco Prod. Co.* v. *Vill. of Gambell, AK,*
    480 U.S. 531 (1987) .................................................... 12

*Ball* v. *LeBlanc,*
    792 F.3d 584 (5th Cir. 2015) ................................................*passim*

*Banks* v. *Booth,*
    3 F.4th 445 (D.C. Cir. 2021) ........................................................ 6

*Book People, Inc.* v. *Wong,*
    91 F.4th 318 (5th Cir. 2024) ........................................................ 32

*Brown* v. *Plata,*
    563 U.S. 493 (2011) .................................................... 32

*Cole* v. *Collier,*
    No. 4:14-CV-1698, 2017 WL 3049540 (S.D. Tex. July
    19, 2017)............................................................. 19, 25

*Doe* v. *Bondi,*
    No. 25-5099 (D.C. Cir.) ............................................................ 5

*Farmer* v. *Brennan,*
    511 U.S. 825 (1994) ................................................ 17, 20, 30, 31

*Gates* v. *Cook,*
    376 F.3d 323 (5th Cir. 2004) ............................................... 18, 26

*Georgia Advoc. Off.* v. *Jackson,*
    4 F.4th 1200 (11th Cir. 2021)....................................................... 6

*Guzman* v. *Hacienda Recs. & Recording Studio, Inc.,*
    808 F.3d 1031 (5th Cir. 2015) ............................................. 24, 30

iv

*Harris* v. *Angelina Cnty., Tex.*,
  31 F.3d 331 (5th Cir. 1994) ...................................................... 26

*United States* v. *Hinds Cnty. Bd. of Supervisors*,
  128 F.4th 616 (5th Cir. 2025) .................................................. 14

*Hinojosa* v. *Livingston*,
  807 F.3d 657 (5th Cir. 2015) .................................................. 18

*Jones* v. *Tex. Dep't of Crim. Just.*,
  880 F.3d 756 (5th Cir. 2018) .................................................. 19

*Lewis* v. *Cain*,
  701 F. Supp. 3d 361 (M.D. La. 2023) .................................. 25, 31

*Mayweathers* v. *Newland*,
  258 F.3d 930 (9th Cir. 2001) .................................................... 5

*Melendez* v. *Sec'y, Fla. Dep't of Corr.*,
  No. 21-13455, 2022 WL 1124753 (11th Cir. Apr. 15,
  2022) ........................................................................................ 5

*Miller* v. *French*,
  530 U.S. 327 (2000) ........................................................ 7, 8, 10

*Monroe* v. *Bowman*,
  122 F.4th 688 (7th Cir. 2024) .................................................... 5

*Pulsifer* v. *United States*,
  601 U.S. 124 (2024) ................................................................ 12

*Realogy Holdings Corp.* v. *Jongebloed*,
  957 F.3d 523 (5th Cir. 2020) .................................................. 32

*Robinson* v. *Ardoin*,
  86 F.4th 574 (5th Cir. 2023) .................................................. 18

*Russello* v. *United States*,
  464 U.S. 16 (1983) .................................................................. 12

*United States* v. *Sec'y, Fla. Dep't of Corr.*,
  778 F.3d 1223 (11th Cir. 2015) ................................................ 5

*Webb* v. *Livingston,*
618 Fed. App'x 201 (5th Cir. 2015) ...................................... 17, 25

*Voice of the Experienced* v. *Westcott,*
No. 24-30420 (5th Cir.) ...................................................... 2, 6, 18

## Statutes

18 U.S.C. § 3626 ........................................................*passim*

## Other Authorities

U.S. Const. amend. VIII ........................................................*passim*

Samuel L. Bray, *The Purpose of the Preliminary Injunction*, 78 Vand. L. Rev. 809 (2025)................................... 13

## INTRODUCTION

For years, DOC's policy was to issue a Heat Alert at a heat index of 88°F.  In October 2024, after over a year of litigation and an interim determination by the district court—affirmed in part by this Court— finding then-existing heat protections likely to be constitutionally deficient, DOC revised its policies to make them even *less protective*. Those revisions require LSP to implement certain of the previously court-ordered protections, but only at a heat index of 91°F or higher.  When questioned about this change, DOC cited agency guidance that, in fact, strongly suggests the revised policy is substantially *more dangerous*. DOC also cited the opinions of an expert witness that the district court subsequently found uncredible and unqualified to opine on heat-related illness or thermoregulation.

Because the revised policies put them at significant additional risk, Plaintiffs moved for a second preliminary injunction.  In May 2025, the district court granted that motion in part, finding DOC was likely deliberately indifferent to a substantial risk of serious harm in violation of the Eighth Amendment, and ordering DOC, for 90 days, to return the Heat Alert threshold to 88°F and monitor the heat index more frequently.

After the May 2025 Order[1] expired, on Plaintiffs' third motion for preliminary relief, the district court again evaluated the evidence and entered a new, narrower preliminary injunction only requiring that DOC maintain its historic Heat Alert threshold, for 90 days. That August 2025 Order, the subject of this appeal, was narrowly drawn, extended no further than necessary to correct the heat-related harm warranting preliminary relief, and was the least intrusive means necessary to correct that harm, in full satisfaction of the PLRA's requirements for preliminary injunctive relief. 18 U.S.C. § 3626(a)(2).

DOC would have this Court believe that the August 2025 Order was improper for four unpersuasive reasons. *First*, DOC reads the PLRA to forbid the district court from exercising its traditional equitable power to issue preliminary relief for more than a single 90-day period over the course of a case. Courts around the country have rejected this interpretation, and DOC has not identified a single order of any court adopting it. *Second*, DOC complains that the August 2025 Order did not make certain statutory findings; findings that the text, structure, and

---

[1] All defined terms used herein have the same meaning as in Plaintiffs-Appellees' Opening Brief, ECF No. 77 ("VOTE Br.").

legislative history of the PLRA conclusively make clear are not required for a 90-day preliminary order. *Third*, DOC asserts that the district court clearly erred in finding DOC deliberately indifferent, claiming it did not consider purported remedial measures DOC has implemented. In fact, the court's deliberate indifference finding rested on a mountain of evidence—including live expert testimony concerning the cumulative effect of DOC's remedial measures—establishing the requisite state of mind for a likely Eighth Amendment violation. *Finally*, DOC argues that the August 2025 Order failed to account for the state's interest in prison administration. But the district court's determination that protecting the lives of men on the Farm Line outweighed the state's interest in implementing an unconstitutional practice was anything but clear error.

This Court should affirm the August 2025 Order.

## ARGUMENT

## I.   THE AUGUST 2025 ORDER COMPORTS WITH THE PLRA.

DOC asserts that the August 2025 Order violates the PLRA for two reasons: it does not satisfy the requirements for an "extension" of a preliminary injunctive order under subsection 3626(a)(2); and, it does not satisfy the requirements for prospective relief established in subsection

3626(a)(1).  Neither assertion is relevant to the issues presented because the August 2025 Order is not an "extension" of a prior preliminary injunctive order or an order for prospective relief.  Rather, it is a new, distinct, and successive order for preliminary injunctive relief.  As such, it is governed by subsection 3626(a)(2), not 3626(a)(1).[2]  Subsection (a)(2) does not require express findings of necessity, narrowness, or minimal intrusiveness; it requires only that the relief ordered "must be" those things.  18 U.S.C. § 3626(a)(2).  Because the August 2025 Order satisfies subsection (a)(2)'s substantive requirements, it is entirely permissible under the PLRA.

## A.    The Order Is a Successive Preliminary Injunction Permitted by the PLRA.

DOC's opening brief repeats DOC's consistent but wrong position that the August 2025 Order represents an "extension" of the May 2025 Order.  DOC Br. 20, 24–33.  In fact, in issuing the August 2025 Order,

---

[2] Although challenging a preliminary injunction order, DOC's Opening Brief conspicuously avoids addressing most of subsection 3626(a)(2), the provision of the PLRA that specifically governs "Preliminary injunctive relief."  DOC's discussion of subsection (a)(2) is primarily focused on its final sentence which addresses the requirements to extend and make "final" a previously granted preliminary injunction, a situation not present here.  DOC Br. 26, 29, 30.  For reasons discussed below, *infra* at 11–15, and in VOTE Br. at 31–38, this Court need not even contend with what those requirements are, or what the last sentence of subsection (a)(2) means.

the district court did not extend or otherwise modify the duration of any prior order.  VOTE Br. 12.  Rather, it considered Plaintiffs' motion for a new preliminary injunction, concluded that the facts demonstrated a need for preliminary relief to prevent irreparable harm, found that Plaintiffs had otherwise satisfied the requirements for preliminary injunctive relief, and ordered narrower relief than in any prior injunction to correct the identified harm.  ROA.11356.

The August 2025 Order therefore falls within the well-recognized category of successive preliminary injunctive relief permitted by the PLRA.  *See* VOTE Br. 22–26.  Such successive orders are far from "lawless."  DOC Br. 29.  As clearly held by the Ninth and Seventh Circuits and endorsed by decisions of the Tenth and Eleventh Circuits, nothing in the text of the PLRA prohibits a district court from entering a separate, successive order for preliminary injunctive relief when a prior order has expired pursuant to the statutory time limit.  *See Mayweathers* v. *Newland*, 258 F.3d 930, 936 (9th Cir. 2001); *Monroe* v. *Bowman*, 122 F.4th 688, 697 (7th Cir. 2024); *United States* v. *Sec'y, Fla. Dep't of Corr.*, 778 F.3d 1223, 1228 n.9 (11th Cir. 2015); *Melendez* v. *Sec'y, Fla. Dep't of Corr.*, No. 21-13455, 2022 WL 1124753, at *21 (11th Cir. Apr. 15, 2022);

*Alloway* v. *Hodge*, 72 F. App'x 812, 817 (10th Cir. 2003); *see also* Appellants' Suppl. Br. at 3–9, *Doe* v. *Bondi*, No. 25-5099 (D.C. Cir. Sept. 24, 2025), Doc. No. 2136849 (federal government adopting position that successive preliminary injunctions are consistent with the text and purpose of the PLRA and are the "consensus view" of the federal courts of appeals).  DOC, meanwhile, cites no case where a court has held that successive injunctions are impermissible under the PLRA.

The cases DOC does cite are inapposite.  DOC Br. 10–11.  *Banks* v. *Booth*, 3 F.4th 445, 448 (D.C. Cir. 2021) and *Georgia Advocacy Office* v. *Jackson*, 4 F.4th 1200 (11th Cir. 2021), *vacated following settlement*, 33 F.4th 1325 (11th Cir. 2022) concern an extension of a prior preliminary injunction, not a new, successive injunction.  And, contrary to DOC's claim that "*VOTE I* governs," DOC Br. 30, that decision did not address the question of successive injunctions for the simple reason that it concerned the very first injunction granted in the underlying proceeding. While the *VOTE I* panel remarked that Plaintiffs "allowed the July 2 preliminary injunction to expire and did not seek to make it permanent under 18 U.S.C. § 3626(a)(2)," *VOTE I*, ECF No. 123-1 at 7, it did not hold

6

that a permanent injunction would be the *only* way for Plaintiffs to obtain further preliminary injunctive relief.

DOC's arguments that the August 2025 Order does not meet the requirements for an "extension" of preliminary injunctive relief pursuant to the final sentence of subsection (a)(2) are misplaced. Again, the August 2025 Order is not an extension of the May 2025 Order; it is a standalone preliminary injunction. As such, the final sentence of subsection (a)(2) is not implicated, and the district court was not required to "make[] the findings required under subsection (a)(1)" nor to "make[] the [prior] order final"—actions which would allow that order to last longer than 90 days. 18 U.S.C. § 3626(a)(2).

DOC's arguments about the policy objectives of the PLRA and the consequences of Plaintiffs' interpretation fall flat. For example, DOC invokes the broad proposition that "curbing the equitable discretion of district courts was one of the PLRA's principal objectives." DOC Br. 3 (quoting *Miller* v. *French*, 530 U.S. 327, 339 (2000)). No doubt. But the Supreme Court made that statement in the context of analyzing a particular statutory provision: the automatic stay of prospective relief triggered by a motion to modify or terminate that relief. *See Miller*, 530

U.S. at 336 (discussing 18 U.S.C. § 3626(e)(2)).  That provision, the Court concluded, necessarily supplanted the district court's traditional equitable authority to "stay the stay," because any other interpretation "would subvert the plain meaning of the statute, making its mandatory language merely permissive." *Id.* at 337 (interpreting the meaning of the word "shall" to be mandatory).  And the Court recognized that it "should not construe a statute to displace courts' traditional equitable authority absent the 'clearest command.'"  *Id.* at 340 (quoting *Califano* v. *Yamasaki*, 442 U.S. 682, 705 (1979)).

Here, DOC can identify no such "clear command."  While Congress imposed limitations on the scope and duration of preliminary injunctive relief absent certain "findings," it did not eliminate district courts' authority to issue such relief in the first place, nor did it specify the number of preliminary injunctive orders permitted in a prison litigation.  Instead, subsection (a)(2) was expressly written *to allow* the issuance of preliminary injunctive relief for periods of 90 days whenever the requirements for such relief are met.  *See* VOTE Br. 21–22.

Nor do successive injunctions "wholly disregard" the statute's 90-day limitation on each order for preliminary injunctive relief.  DOC Br.

29.  To the contrary, successive orders expressly recognize and enforce that limitation by requiring plaintiffs to newly satisfy the requirements for preliminary injunctive relief once the prior order has expired.[3]

By contrast, DOC's position carries dire consequences.  Put simply, DOC's view is that a plaintiff in a prison conditions case is entitled to *one* preliminary injunction of 90 days—no matter how long the path to trial nor how severe the constitutional violation and irreparable harm.  After that 90-day period, prison officials are free to engage in likely unconstitutional conduct until the entire litigation resolves.  Absurd. Imagine, for example, a putative class seeking relief on multiple constitutional and statutory claims arising from a prison policy restricting the celebration of Christian holidays.  A preliminary injunction entered in December would ensure plaintiffs' ability to celebrate Christmas, but would expire before Easter—likely in too little time for discovery, class certification, and a final judgment on the merits.

---

[3]  Plaintiffs' interpretation does not permit successive injunctions "ad infinitum." DOC Br. 32.  Assuming the conditions for such preliminary relief endured (and were not otherwise stayed pending appeal, as was the case with the instant Order), it would permit successive 90-day orders only until the court could make the "findings" required for the entry of prospective relief or render a decision on the merits.

And the district court would be powerless. Nothing in the statute compels that nonsensical result.

Moreover, DOC's proposed alternative—that the district court simply proceed to trial on the merits and enter a permanent injunction "*that resolves the case*" within 90 days of an initial preliminary order—is similarly problematic. DOC Br. 26 (emphasis added). DOC's interpretation would upend the core function of temporary relief as a mechanism to maintain the status quo during the pendency of a litigation, effectively requiring parties to either suffer irreparable harm while awaiting trial or compress a complex class action into a 90-day timeframe. That is unworkable and would raise serious due process concerns. *See Miller*, 530 U.S. at 349–50. Here, for example, Plaintiffs are bringing multiple constitutional claims—not all heat-related—as well as claims under the ADA and Rehabilitation Act, on behalf of multiple classes. In addition to the discovery needed for such claims, which has included almost 50 depositions and the exchange of thousands of pages of documents, Plaintiffs' motion for class certification alone has been pending for over a year.

**B.     The Challenged Relief Is Necessary, Narrow, and Minimally Intrusive, Satisfying Subsection 3626(a)(2).**

DOC also misapprehends the PLRA's substantive requirements for preliminary injunctive relief.   DOC relies on subsection (a)(1)(A)'s mandate that "a court 'shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.'"   DOC Br. 33 (quoting 18 U.S.C. § 3626(a)(1)(A)).   That accurately describes the requirements for *prospective relief*.   But this appeal addresses an order for *preliminary injunctive relief*, and is therefore governed by subsection (a)(2).   Subsection (a)(2) requires that "[p]reliminary injunctive relief *must be* narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm."   18 U.S.C. § 3626(a)(2) (emphasis added).   The plain text of subsection (a)(2) requires no formal findings.

1.     DOC implicitly argues that all of the requirements for prospective relief established in subsection (a)(1) also apply to

11

preliminary injunctive relief. That position is directly contrary to the text, structure, and history of the PLRA. VOTE Br. 31–40.

Beginning with the text, *first*, as noted, the language of subsection (a)(1) expressly mandates a court to make "need, narrowness, non-intrusiveness" findings with respect to the relief entered, whereas the language of subsection (a)(2) does not. That difference is meaningful. *See Russello* v. *United States*, 464 U.S. 16, 23 (1983). *Second*, requiring a district court to make subsection (a)(1) findings when it first enters an order for preliminary injunctive relief would render superfluous the clause of subsection (a)(2) that makes those findings a requirement for *extension* of such an order beyond 90 days. *See Pulsifer* v. *United States*, 601 U.S. 124, 143 (2024). *Third*, subsection (a)(1) requires finding a "violation of the Federal right" invoked by plaintiffs—an improper conclusion at the preliminary injunctive stage. *See Amoco Prod. Co.* v. *Vill. of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987).

Turning to structure, Section 3626 consistently establishes separate rules governing prospective relief and preliminary injunctive relief, respectively, throughout. Subsections (a)(1) and (a)(2) establish separate requirements for entering the two separate forms of relief; and

subsections (b) and (a)(2) establish separate requirements for terminating the two separate forms of relief. DOC would have the Court ignore these structural differences. Additionally, DOC's position that preliminary injunctive relief is a subcategory of prospective relief would impermissibly collapse that structure by overwriting the specific directions for preliminary injunctive relief contained in subsection (a)(2).

Finally, legislative history confirms that Congress viewed preliminary injunctive relief as a separate form of relief from prospective relief. Subsection (a)(2) post-dates the initial draft of the statute and was expressly added because Congress recognized that the provision for prospective relief did *not* allow for temporary, emergency relief in the form of a preliminary injunction. *See* VOTE Br. 38–40. That is consistent with the traditional role of preliminary injunctive relief within a court's arsenal of equitable powers: unlike prospective relief, a preliminary injunction is "temporary, nondeterminative, and based on partial evidence, and it requires a showing of irreparable injury." Samuel L. Bray, *The Purpose of the Preliminary Injunction*, 78 Vand. L. Rev. 809, 815 (2025).

2.    Because DOC's opening brief erroneously focuses on the requirements for prospective relief, it fails to address whether the August 2025 Order satisfies the requirements for preliminary injunctive relief under subsection (a)(2).   For example, DOC relies heavily on *United States* v. *Hinds County Board of Supervisors*, 128 F.4th 616 (5th Cir. 2025), DOC Br. 9, 34, but *Hinds* does not concern a grant of preliminary injunctive relief under subsection (a)(2); it concerns the entry of prospective relief following a final mitigation hearing under subsection (a)(1)(A). *Hinds*, 128 F.4th at 622–23, 625.  Plaintiffs do not dispute that findings are required for such relief.

The  August  2025  Order  readily  meets  the  applicable  (a)(2) requirements.  VOTE Br. 27–30.  The relief ordered was necessary to prevent men on the Farm Line from being required to labor outdoors absent adequate heat protections. *See* ROA.11356.  It is narrowly drawn in accordance with this Court's precedents, extending only to the Farm Line at LSP and requiring only that DOC temporarily maintain its historic Heat Alert policy. *Id.*  And it is no more intrusive than necessary because it simply directs DOC to revert to a policy that is scientifically supportable and that DOC had in place for years.  ROA.11355–356.

14

In an oblique challenge to the August 2025 Order's supposed "intrusiveness," DOC levels a charge of judicial "policymaking." DOC Br. 42–43. This is curious because Defendants themselves originated and longtime followed the challenged policy. Further, DOC's contention that the Order constitutes "micromanagement" as an "attempt to alter prison operations in a matter of degrees," *id.*, only underscores the Order's precision and compliance with the narrowness requirement of the PLRA. Finally, as Dr. Vassallo testified, heat-related illness and mortality increase almost exponentially with each degree in that range and "a matter of degrees" in this context can be a matter of life and death. ROA.11355–356.

Accordingly, the relief satisfies the mandates of subsection (a)(2).

## II. THE DISTRICT COURT DID NOT COMMIT CLEAR ERROR IN FINDING PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR EIGHTH AMENDMENT CLAIMS.

At the time this litigation began, DOC had a policy of calling a Heat Alert at 88°F—the exact same policy that the August 2025 Order requires. ROA.8232. Until a Heat Alert is called, DOC is not required to offer any meaningful heat protections, like scheduled breaks, access to shade, water, or ice. And critically, until a Heat Alert is called, men with

known heat sensitivity are forced to remain outside, laboring in the blistering heat.

In July 2024, the district court found that, even under DOC's prior policy, DOC's operation of the Farm Line likely violated the Eighth Amendment because the heat protections available once a Heat Alert issued were insufficient. ROA.3153–154. It ordered DOC to implement certain additional protections, like adequate shade, rest, and personal protective equipment, *on top of* those DOC already offered when the heat index hit 88°F.[4] ROA.3160. In support of that underlying motion for relief, Plaintiffs submitted copious credible evidence, including evidence that 88°F is a critical threshold at which heat becomes dangerous to human health and safety without adequate mitigation. ROA.382–1848, 2868–989.

It was only *after* DOC was confronted with that evidence, and *after* the district court correspondingly found DOC to be likely in violation of the Eighth Amendment—even while calling a Heat Alert at 88°F—that

---

[4] The district court's July 2024 Order did not, as DOC suggests, bless the operation of the Farm Line with no meaningful heat protections in temperatures exceeding 88°F. DOC Br. 39. The court's analysis turned on what *additional* protections were warranted at that threshold.

DOC elected to *raise* the threshold for a Heat Alert to 91°F. That is quintessential deliberate indifference. Supreme Court precedent is unambiguous that defendants in a prison litigation cannot turn a blind eye to evidence presented in the proceedings revealing that its policies and practices fall below the constitutional minimum. *Farmer* v. *Brennan*, 511 U.S. 825, 846 n.9 (1994) ("If, for example, the evidence before a district court establishes that an inmate faces an objectively intolerable risk of serious injury, the defendants could not plausibly persist in claiming lack of awareness.").

Moreover, DOC's largely uncodified "remedial" measures fail to cure DOC's deliberate indifference because they are inadequate to fix the constitutional infirmity identified, as DOC is well aware. *Webb* v. *Livingston*, 618 Fed. App'x 201, 209 n.7 (5th Cir. 2015).

### A. The District Court Did Not Err in Finding DOC Likely Deliberately Indifferent.

To constitute an Eighth Amendment violation, "prison conditions must pose 'an unreasonable risk of serious damage' to a prisoner's health—an objective test—and prison officials must have acted with deliberate indifference to the risk posed—a subjective test." *Ball* v. *LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015) (quoting *Helling* v. *McKinney*,

509 U.S. 25, 33–35 (1993)). The district court's finding that both prongs were satisfied was not clearly erroneous. *Robinson* v. *Ardoin*, 86 F.4th 574, 592 (5th Cir. 2023) (holding that factual findings are subject to review only for clear error).

### 1. DOC Concedes the Objective Prong.

There is no dispute that the objective prong of the Eighth Amendment analysis is satisfied here. The Fifth Circuit has already held in this case that "[i]t is well-established in our circuit that the Eighth Amendment guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate remedial measures." *VOTE I*, ECF No. 41-1 at 7 (quoting *Yates* v. *Collier*, 868 F.3d 354, 360 (5th Cir. 2017)); *see also Ball,* 792 F.3d at 596; *Hinojosa* v. *Livingston*, 807 F.3d 657, 667 (5th Cir. 2015); *Gates* v. *Cook*, 376 F.3d 323, 340 (5th Cir. 2004).

DOC makes no attempt to justify the 91°F Heat Alert threshold under this objective framework. It does not dispute the global scientific consensus that the risk of morbidity and mortality from heat-related illness increases sharply at heat indices in the mid-80s and higher. *See* ROA.7338 nn.7–9. It does not dispute that this Court has endorsed 88°F

18

as the threshold at which meaningful heat protections become necessary. *See, e.g., Ball*, 792 F.3d at 598–99. And it does not dispute that the agency guidance DOC itself cited to justify the 91°F Heat Alert threshold "either does not support" or "outright contradict[s]" that decision. ROA.10224–228.

      2.    *The Subjective Prong Is Satisfied Because the Risks of DOC's New Policy Were Open, Obvious, and Known.*

DOC concedes the objective risk of serious illness or death, but it contends it was somehow unaware of that risk. *See* DOC Br. 41. This claim is directly contradicted by the evidence.

"A prison official acts with deliberate indifference 'only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.'" *Jones* v. *Tex. Dep't of Crim. Just.*, 880 F.3d 756, 759 (5th Cir. 2018) (quoting *Farmer*, 511 U.S. at 847). Satisfaction of the subjective prong is a question of fact, "subject to demonstration in the usual ways, including inference from circumstantial evidence," but also where a risk was simply "obvious" to defendants. *Ball*, 792 F.3d at 594; *Cole* v. *Collier*, No. 4:14-CV-1698, 2017 WL 3049540, at *40 (S.D. Tex. July 19, 2017).

The district court did not clearly err when it found this subjective prong satisfied. As the district court made clear in the August 2025 Order, the evidence presented throughout this litigation has put DOC on notice that a Heat Alert policy triggered at 91°F would be unconstitutionally dangerous. ROA.11355 n.1. Where "the evidence before a district court establishes that an inmate faces an objectively intolerable risk of serious injury, the defendants could not plausibly persist in claiming lack of awareness," in opposition to a finding of deliberate indifference. *Farmer*, 511 U.S. at 846 n.9.

DOC's claim of ignorance is implausible. The record shows DOC has long known of and disregarded the risks of serious harm or death at heat indices at or above 88°F. As Plaintiffs explained in their petition for the preliminary injunction on appeal here, ROA.11313–324, record evidence supporting that unavoidable conclusion includes:

- On May 13, 2024, Dr. Vassallo's first declaration in support of Plaintiffs' first request for a preliminary injunction explained that "[s]tudies have shown that the incidence of heat-related deaths increases sharply starting at temperatures or heat index numbers in the mid to high 80s." ROA.7380–381 ¶ 67.

- On July 2, 2024, the district court's first preliminary injunction reviewed Dr. Vassallo's testimony regarding the sharp increase in the "risk for heat stroke and heat-related disorders" when the heat index exceeds 88°F, as well as agency guidance stating that, at heat indices at or above 88°F, "extreme caution" is warranted, as "the risk of heat injury is high in this situation." ROA.3123–24, 3130.

- On September 20, 2024, the deposition of Dr. Keldie, Defendants' purported expert, demonstrated that he was neither qualified to opine on matters of heat-related illness or thermoregulation, nor able to justify the increased Heat Alert threshold with any medical or scientific evidence. *See* ROA.4504–505 at 225:22–228:24 (struggling to back up position that a Heat Alert threshold of 95°F would be "extremely safe," and conceding he did not fully comprehend the exhibits that he submitted as part of his expert report).

- On September 30, 2024, Plaintiffs filed a supplemental declaration of Dr. Vassallo reiterating that men on the Farm Line "are at substantial risk of serious harm due to their prolonged exposure to heat indices above 88° Fahrenheit." ROA.5605–606 ¶ 1.

- On February 12, 2025, DOC's 30(b)(6) witness and Chief Medical

Officer, Dr. Randy Lavespere, could not identify evidence in support of the 91°F threshold, was not aware of any agency guidance DOC had relied on in support of that threshold besides a chart on the NWS website that he conceded is only applicable to shady locations. ROA.7463 at 70:2–18, 7467–469 at 74:19–76:12 (conceding DOC arrived at 91°F not because of Dr. Keldie's opinion but because defense counsel felt that 91°F "would be more reasonable to the court"), ROA.7487 at 94:1–18 (conceding that "for a person laboring in direct sun, a heat index of 91 degrees could actually be increased to up to 106 degrees," well in NWS's "danger zone"); *see also* ROA.7990 (NWS chart cited by DOC).

- On March 26, 2025, Plaintiffs submitted another declaration from Dr. Vassallo citing the significant body of peer-reviewed scientific and medical literature demonstrating that the risk of heat-related illness and death "increases sharply" in the mid-to-high 80s, and that any increase beyond 88°F poses an even higher risk.  ROA.7338 ¶¶ 14–15.

- On April 23, 2025, at the evidentiary hearing held before the district court, Dr. Vassallo testified as to the scientific consensus that rates of heat-related illness and death increase almost exponentially at heat

indices at or above 88°F.  ROA.10039–043 at 57:5–58:22, 59:20–61:14. At that same hearing, Dr. Keldie again confirmed his lack of relevant expertise and credibility.  ROA.10895–900 at 90:22–93:17, 93:24–95:19.

- On May 23, 2025, the district court issued an order granting a second preliminary injunction crediting and highlighting Dr. Vassallo's testimony about the dangers of DOC's current heat policies, and noting that evidence marshalled by DOC in opposition did not support or "outright contradict[ed]" Dr. Keldie's opinions and DOC's policy. ROA.10224–228.

The vacatur of the district court's prior orders on mootness grounds does not have the effect of winding back the clock, deleting this substantial, compelling, and unrefuted evidence from the record, or erasing it from DOC's memory, as the district court recognized. ROA.11355 n.1.

Far from mere "background section" language, DOC Br. 38, the above demonstrates that DOC has been confronted with a mountain of unrefuted and irrefutable evidence that put it on notice—repeatedly— that its heat policies put men in danger.   The district court's

determination that, as a factual matter, DOC was aware of the dangers of insufficiently mitigated exposure to heat indices exceeding 88°F was not clearly erroneous. It was rooted in evidence found credible not only in various court orders, but following an in-person hearing at which both Dr. Vassallo and Dr. Keldie testified. ROA.10223 (finding the testimony of Dr. Vassallo to be "credible, thorough, and supported by scientific literature"), 10223–225 (finding Dr. Keldie "wholly uncredible"), ROA.12131–132 at 49:15–18, 49:21–25, 50:8–20, 12135 at 53:8–22 (identifying Dr. Keldie's lack of relevant prior expert qualifications, current board certifications, published works, and recent patient care experience and declining to qualify him as an expert on thermoregulation or heat-related illness). These credibility determinations are to be awarded the highest deference by a reviewing court. *Guzman* v. *Hacienda Recs. & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015) (credibility determinations following live testimony "can virtually never be clear error").[5]

---

[5] DOC is simply wrong in claiming that the district court did not make a deliberate indifference finding in the August 2025 Order. DOC. Br. 41–42. The district court found "Plaintiffs have also shown that Defendants have likely been deliberately indifferent." ROA.11352.

## B.    The Purported Remedial Measures Do Not Cure DOC's Deliberate Indifference.

DOC argues that it has implemented various remedial measures and therefore could not possibly be deliberately indifferent to the threat posed by extreme heat on the Farm Line.  DOC Br. 12–14, 40.  These allegedly include "the construction of shade wagons and pavilions," revisions to the medications and illnesses lists qualifying men for Heat Protection Duty Status ("HPDS"), the "imposition of protective measures regardless of the weather," and other unidentified revisions to the heat policies.  DOC Br. 40 (emphasis omitted).  The gist of DOC's defense is that the sum total of its purported "improvements" somehow counterbalance the medically unsound and arbitrary decision to raise the threshold at which all heat protections are mandated well beyond a safe threshold.  *Id.* at 16.

"[T]he mere presence of remedial measures [does] not end the inquiry, as such measures must be adequate."  *Webb*, 618 F. App'x at 209 n.7; *see also Lewis* v. *Cain*, 701 F. Supp. 3d 361, 435 (M.D. La. 2023); *Cole*, 2017 WL 3049540, at *41 (attempts at mitigation alone are not

25

dispositive, courts must also evaluate "the effectiveness of the measures implemented").[6]

After being presented with voluminous evidence, in-person testimony, and extensive briefing—including about DOC's purported remedial measures—the district court's finding that DOC likely acted with deliberate indifference despite those measures was far from clear error. ROA.11352 (holding DOC's "current policies and practices place incarcerated persons at LSP at substantial risk of suffering serious harm," to which DOC has "likely been deliberately indifferent").

**Shade Structures.** Beginning in October 2024, DOC constructed "shade wagons" to provide shade for some, but not all farm lines. ROA.6176. As DOC knows, even when available, the shade wagons are insufficient to address the serious risk of heat-related harm. Indeed,

---

[6] This Court has repeatedly upheld deliberate indifference findings where defendants undertook even more sweeping remedial measures than the ones DOC alleges here. *See Ball*, 792 F.3d at 595–96 (affirming deliberate indifference to known risk of heat injury even after LSP began providing misting, fans, access to ice water, and daily showers); *Gates*, 376 F.3d at 340–41 (affirming deliberate indifference despite prison's extensive remedial efforts regarding cell conditions and healthcare); *Harris* v. *Angelina Cnty., Tex.*, 31 F.3d 331, 335–36 (5th Cir. 1994) (affirming prison's deliberate indifference to crowding risks where prison built a dormitory, transferred individuals, and offered alternatives to incarceration).

DOC has been confronted with virtually unrebutted evidence throughout this litigation that simply providing occasional shade cannot make up for the dangers of cumulative exposure to extreme heat. *See* ROA.7888 ¶¶ 16–17 (Dr. Vassallo opining that shade canopy is "insufficient to reduce the risks posed by exposure to heat hazards while forced to labor in the fields," especially when structure was placed far from worksite). Dr. Vassallo has evaluated the shade wagons and found them inadequate, opining in March 2025 that "limited exposure to shade does not mitigate the risk of heat-related illness experienced by men who labor for hours in Louisiana's hot sun and high humidity," especially where men cannot recuperate in air conditioning after Farm Line shifts end. ROA.7349–350 ¶¶ 57–58. In April, she again credibly testified to this issue. ROA.10515 at 48:7–19 (discussing cumulative impact of heat). Around the same time, men on the Farm Line provided sworn statements that due to the position of the sun, the shade wagons do not actually provide shade or cooling. *See, e.g.*, ROA.9857 ¶ 6 (April 21, 2025 declaration of Frank Carter stating that "[i]t is hotter to sit under the trailer because the sun makes the seats hot and there is often no shade directly under it.").

As to the "shade pavilions" the only evidence in the record is a photograph and map appended to an opposition brief, with a discussion of DOC's future plans. ROA.8831, 8872, 8873. There is no record that a single shade pavilion is operational and being used by the Farm Line, no less is effective. *See, e.g.*, ROA.11268, 11307, 11342 (Daily Line Counts from July and August 2025 reflecting no shade pavilion in use).

**Revised HPDS Lists.** Revisions DOC has made to the medications and illnesses lists that inform which men receive HPDS only underscore DOC's deliberate indifference. DOC has long known that heat sensitive people are at heightened risk, ROA.420 ¶ 17, and has itself acknowledged that men with HPDS are particularly heat sensitive, ROA.11981–985 at 236:17–240:24. Yet, under the revised Heat Alert policy, those men are now forced to labor in temperatures exceeding 88°F, a point at which, as discussed *supra* Section II.A, DOC knows the threat of heat-related illness and death increases almost exponentially.

**Heat Protections Regardless of Weather.** DOC also points to a number of measures it purports to implement "regardless of the weather." DOC Br. 40. Aside from the fact that these supposed improvements are disputed, uncodified, and entirely voluntary,

conspicuously absent from this list is perhaps the most important heat protection attendant in a Heat Alert: that men with recognized heat sensitivity be immediately taken inside. DOC brushes off this failure, asserting that its Heat Alert policy changes have "no practical effect on average prisoners," DOC Br. 14–15, while ignoring the significant population of men with HPDS left at heightened (and unconstitutional) risk. ROA.11984–985. That attitude demonstrates the very deliberate indifference the district court found.

**Cumulative Impact of "Remedial" Measures.** It has long been clear that the sum total of DOC's remedial measures is inadequate as well. Evidence of that was directly before, and clearly considered by, the district court. For example, at the April 2025 evidentiary hearing, both Drs. Keldie and Vassallo opined on this very issue, creating a battle of experts that Plaintiffs clearly won in May 2025. ROA.10222–225; *see also* ROA.10230 n.8 (acknowledging Dr. Vassallo had opined that sum total of remedial measures was inadequate, not just Heat Alert threshold). Thus, while DOC still heavily relies on Dr. Keldie's assertion that "'there is little or no risk' to prisoners who have access to the new protective measures" DOC has implemented, DOC Br. 41 (quoting ROA.9526), at

the hearing, Dr. Keldie was found unqualified to testify as an expert in both thermoregulation and heat-related illness, and deemed "wholly uncredible," by the district court. ROA.10223–225.

Meanwhile, Dr. Vassallo, who has been deemed a "credible expert in the field of thermoregulation" by the district court, "the Fifth Circuit and other district courts," ROA.10222, opined that DOC's remedial measures, "even if diligently implemented, would be insufficient to adequately protect men on the Farm Line," ROA.7335 ¶ 4; *see generally* ROA.7335–349. The district court made its credibility determinations as to these two experts in May 2025, and DOC makes no effort to challenge that determination under the extremely demanding standard of review. *See Guzman,* 808 F.3d at 1036. Thus, if DOC did not already know that its remedial measures were inadequate by that point—even taken as a cumulative whole—it certainly knew then. *See Farmer*, 511 U.S. at 846 n.9.

Finally, DOC has all but admitted that its purported remedial measures are mere litigation strategy. ROA.8430–433 at 264:8—267:25 (DOC Chief Medical Officer and 30(b)(6) witness testifying that DOC's implementation of remedial measures depends on trial date in this

matter), ROA.7463 at 70:2–18 (same, testifying that DOC chose 91°F for Heat Alert because counsel thought it would be "more reasonable to the court"), ROA.7489 at 96:16–25 (same, testifying that whether DOC will account for effects of direct sun on heat index thresholds "depends on how this court case comes out."). In this regard, that DOC did not codify in policy the practices it now claims show a lack of deliberate indifference speaks volumes. *See Farmer*, 511 U.S. at 846 n.9 (Although defendants may "prov[e], during the litigation, that they [a]re no longer unreasonably disregarding an objectively intolerable risk of harm," they must also show "they would not revert to their obduracy upon cessation of the litigation."); *Lewis*, 701 F. Supp. 3d at 440–41 ("Changes made by defendants after suit is filed do not remove the necessity for injunctive relief, for practices may be reinstated as swiftly as they were suspended.") (citing *Gates* v. *Collier*, 501 F.2d 1291, 1321 (5th Cir. 1974)).

In sum, the district court did not err in finding DOC deliberately indifferent.

## III.  THE DISTRICT COURT'S EQUITIES ANALYSIS WAS NEITHER INSUFFICIENT NOR CLEARLY ERRONEOUS.

The district court's finding that the balance of the equities favors Plaintiffs was not clear error. ROA.11356. DOC's contrary position rests

on an apparent belief that the state's authority to administer its prisons outweighs any other interest.  DOC Br. 44.  That is not the law, and the district court did not err in concluding that preventing an exponential risk of serious or life-threatening harm—by requiring the state to temporarily follow the same policy it voluntarily followed for years—overcomes the state's interest in imposing an arbitrary, dangerous, and likely unconstitutional new policy.  ROA.10235 (district court collecting cases in the May 2025 Order); *see also Brown* v. *Plata*, 563 U.S. 493, 511 (2011).  DOC has no legitimate interest in operating the Farm Line in violation of the Constitution and preventing constitutional violations is always in the public interest.  *See Book People, Inc.* v. *Wong*, 91 F.4th 318, 341 (5th Cir. 2024); *see also* ROA.10235 (quoting *Marlowe* v. *LeBlanc,* 2020 WL 1983915, at *2 (M.D. La. Apr. 27, 2020)).[7]

DOC is also mistaken that this Court's decision on the stay motion filed in *VOTE I* supports its position.  DOC Br. 39.  In fact, this Court *permitted* injunctive relief impacting the operation of the Farm Line to

---

[7] DOC is incorrect that the district court's equities analysis lacked sufficient detail. DOC Br. 43.  An interlocutory order need not make express findings—it must only offer sufficient basis for appellate review.  *Realogy Holdings Corp.* v. *Jongebloed*, 957 F.3d 523, 530 (5th Cir. 2020).  The district court's incorporation of the factual findings and legal conclusions from its May 2025 order satisfies that requirement.

take effect.  ROA.7355, 7360 (denying state's motion to stay with respect to relief specifically targeting the Farm Line).

## CONCLUSION

For the foregoing reasons and those set forth in Plaintiffs' opening brief, this Court should affirm the August 2025 Order.

Respectfully submitted,

/s/ JEREMY A. BENJAMIN
**PAUL, WEISS, RIFKIND,**
  **WHARTON & GARRISON LLP**
JOSHUA HILL JR.
JEREMY A. BENJAMIN
LEAH R. WEISER
CHIZOBA D. WILKERSON
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:  (212) 373-3000
Fax:  (212) 757-3990
*jhill@paulweiss.com*
*jbenjamin@paulweiss.com*
*lweiser@paulweiss.com*
*cwilkerson@paulweiss.com*

KIMBERLY GRAMBO
2001 K Street, NW
Washington, DC 20006-1047
Tel:  (202) 223-7300
Fax:  (202) 223-7420
*kgrambo@paulweiss.com*

ANNA M. STAPLETON
535 Mission Street, 25th Floor
San Francisco, CA 94105
Tel:  (628) 432-5100
Fax:  (628) 232-3101
*astapleton@paulweiss.com*

THE PROMISE OF JUSTICE
  INITIATIVE
SAMANTHA POURCIAU
1024 Elysian Fields Avenue
New Orleans, LA 70117
Tel:  (504) 529-5955
*sbosalavage@defendla.org*

RIGHTS BEHIND BARS
LYDIA WRIGHT
1800 M St. NW
Fnt. 1 #33821
Washington, D.C. 20033
Tel:  (202) 455-4399
*lydia@rightsbehindbars.org*

*ATTORNEYS FOR PLAINTIFFS-*
*APPELLEES AND THE PROPOSED*
*CLASSES*

OCTOBER 27, 2025

## CERTIFICATE OF SERVICE

I, Jeremy A. Benjamin, a member of the Bar of this Court and counsel for Plaintiffs-Appellees, certify that, on October 27, 2025, a copy of Plaintiffs-Appellees' Reply Brief was filed with the Clerk through the Court's electronic filing system.  I further certify that all parties required to be served have been served.

/s/ JEREMY A. BENJAMIN
JEREMY A. BENJAMIN

# CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Jeremy A. Benjamin, a member of the Bar of this Court and counsel for Plaintiffs-Appellees, certify, pursuant to Federal Rule of Appellate Procedure Rule 32(a)(7)(B) and Fifth Circuit Rule 32, that Plaintiffs-Appellees' Reply Brief is proportionately spaced, has a typeface of 14 points or more, excluding footnotes, which are in 12-point proportionally spaced typeface, and contains 6,476 words.

*/S/ JEREMY A. BENJAMIN*
JEREMY A. BENJAMIN

OCTOBER 27, 2025